Curia, per
Wardlaw, J.
The 1st, 5th, 7th and 8th grounds of appeal are sufficiently answered in the report of the presiding Judge.
As to the 3d and -4th grounds. The evidence admitted was of declarations of the testator at the partition of Col. Wm. Farr’s estate, and was admissible to shew the intention which he then had as to the future disposition of his property; a circumstance fit to go to the jury, but feeble in proportion to the distance of the time from the date of the paper in question.
As to the 6th ground. Of the declarations of Fan, only those were admitted which were made when the testator was present, and with them went evidence of his being intoxicated at the time, which the jury must be supposed to have considered in deciding what weight to give to his seeming submission to the authority over him implied by the declarations.
As to the 13th ground, A special verdict maybe found by consent of parties, or by the direction of the Judge, or at the discretion of the jury, but cannot be claimed of right by one party; and a special verdict must find facts, and not the evidence tending to establish them.
As to the '10th ground. William Mansfield proved nothing which was in itself material to the case, but simply what reconciled Mrs. Mansfield’s testimony with the seem *99 ing contradiction which Jenkins had been called to make; and so far, a witness of the defence attacked in reply may be sustained by rejoinder.
The 2d ground objects to the verdict because D. A. Thomas, who was one of the persons that approved the validity of the will before the Ordináry, and appealed from his decision, now appears, from the proof that was made upon the trial of the appeal in the Circuit Court, to have no interest in the question; and it is insisted for the executor that the verdict is by this proof shewn to be wrong, and that this court is bound to send the case back for trial between the true parties in interest, freed from the embarrassment and improper influence which the misjoinder must be presumed to have produced; and this, although the objection for want of interest is now taken for the first time. The fatal effect of misjoining with a real plaintiff one who has no interest, in ordinary cases, whether at law or in equity, is established by abundant authority. 1 Bail. 306 ; 4 Russ. 225; 3 M. <fe K. 450. But this is an appeal (taken before the Act of 1839,) from the Ordinary’s decree, as to an executor’s right to have probate of a will; and so far as a contrary course is not directed by our statutes- or practice, must be governed by the principles which in similar cases direct the English Ecclesiastical courts. All grants of probates are proceedings in rem, and prevail against all persons wherever the power which granted them extends, whilst they subsist unrevoked; they are liable to be reviewed, if not granted in solemn form; and when so granted are conclusive against all persons cited or privy to the proceedings. Swinb. 807, note; 2 Phil. 212. The denial of probate affects the executor, and those represented by him, but decides nothing as to the rights of persons claiming to be next of kin. It is for the advantage of an executor, that in a contest as to the validity of the will which appointed him, all persons Avho may have interest, as next of kin, or legatees under another will, should be cited, so that if successful, he may not be again put to proof; and it is desirable for those Avho really have interest, that no strangers should be allowed to intrude upon the proceedings, so as to increase delay and expense, or to exclude material testimony, or to introduce unnecessary prejudices.
*100 Hence in the Ecclesiastical courts, any person may, before grant of probate, by entering a caveat, even in a fictitious name, require proof of a will in solemn form; but after the due citations, the executor having propounded the will and offered his proofs, may object to any person’s calling witnesses or appealing, before the interest of such person be regularly propounded. ■ See Eccles. Rep. index, Interest. If the interest be not admitted when propounded, it must be established by proof proceeding pari passu' with that offered as to the will; but the interest of a party cannot be denied after it has once been admitted. In this. State, an appeal would lie from the decision of the Ordinary upon a question of interest, as upon any other question. This executor might have required that the persons who opposed his claim, after shewing their interest, should have exhibited a formal allegation containing at least the grounds of their opposition clearly specified; and after a decree in his favor, he was not upon appeal bound to plead to any issue in the Circuit Court, which was tendered by a person who was not a party before the Ordinary, or which contained any question not decided by the Ordinary. But after the executor, waiving his right to all preliminary inquiries, has pleaded to the issue, and the appeal has been decided against him, it is too late for him to object, in the court of last resort, that one of his adversaries had no interest in the subject matter.
The 9th, 11th and 12th grounds, which object to the charge of the Judge, and the sufficiency of the evidence, will be considered together. The statutes under which the appeal from the Ordinary was taken in this case, (7 Stat. 295, 256, 220,) require “errors” to be assigned, and matters of fact to be tried by a jury.. By our practice, under these statutes, upon an appeal from the decree of an Ordinary, as to the validity of a will, a trial de novó is had according to the rules of the common law, under an issue framed so as to be suitable to the decision of a jury. The tendency which juries have manifested, to restrain the right of testamentary disposition, by setting aside, upon slight proof, wills which seem to them unequal or unsuitable, is to be guarded against by clear expositions of the law from the circuit judge, and the interference of this court *101 when a verdict is manifestly erroneous. But when the law has been properly expounded, verdicts upon facts, in cases of wills, are to be regarded as like verdicts in other cases, and must be left undisturbed, where there is conflicting-testimony, although it may appear to this court, unacquainted with the witnesses, and having only a summary statement in writing of the evidence, instead of the full hearing of the ore terms examinations, that a different conclusion should have been attained. The jury in this case were instructed that the will must stand unless it was procured by the undue influence of Fan alone, or of her and the executor, exercised directly in relation to it; and this court understands that not only were specified acts of influence declared not to be such as the law considers undue and improper, and the jury thus negatively directed, but that the meaning of undue influence was explained positively with as much exactness as the subject admits; the former decision in this case was adverted to, and the distinctions then made pointed out, and the question submitted was, whether there existed the animus testandi, whether the will was of the free consent of the testator, or was obtained by means which extorted “what he was unwilling to grant but unable to withhold.” The jury, fully instructed as to the nature and degree of the influence which the law requires to impeach a will, and warned that certain acts of influence pointed out would not avail, were left to decide whether undue influence, as before explained, was proved; and this was a question of fact for the jury. The former opinion in this case (Cheves, 37,) was not meant to overthrow the case of Tillman vs. Hatcher, (Rice, 271,) and other cases preceding it, which had declared the question of undue influence a question for the jury. When it was said “what facts, if proved, shall constitute undue or improper influence to avoid a will, I hold to be a question of law,” the intention was to declare that the law defined the nature of the influence which it considered undue or improper, and that the Judge should explain it, and give his opinion whether a certain state' of facts (including the condition of the testator and all the other circumstances of the case appearing to be proved) amounted to it; but that the question whether the proposed state of facts, in the *102 form assumed, existed, must be left to the jury; as must also the question whether amidst the many various combinations which may be made of the circumstances of a case, any one existed which would shew the required degree of influence, such as rendered the testator no longer a free agent. The question of influence is like the question of unsound mind; both are inquiries as to the animus testandi, and are embraced in the general question, — Is the paper propounded the will of the testator ? As the imputation of unsoundness asserts that assent is wanting, because the mind of the testator was in itself insufficient for the act, so the charge of undue influence alleges some external constraint under which the act was done, so strong as to deprive it of free consent. The law, in questions of unsound mind, prescribes general rules, and in opposition to vulgar, opinion maintaining the legal ability of testators in instances of great decline or dullness of faculties, asks whether there was capacity to assent to the act. So as to imputed influence, the law gives general rules, and declaring many instances of entreaty or control which are vulgarly esteemed unfair, tobe of themselves innocent, inquires whether the testator was left a free agent, notwithstanding the motives and inducements brought to bear upon him ; and only where he was not so left, pronounces influence undue or improper. But in the application of the rules either as to unsoundness or as to undue influence, every case will have its own circumstances which the jury must consider. No uniform standard, unvaried by the particular habits, character and situation of the testator, and of all the other parties to the transaction, can be applied so that in every case the same state of external facts shall produce the same conclusion, and even if the jury should find in the most exact statement all the evidence tending to produce a conclusion as to the fact involved in the question, whether the testator’s mind was or was not left free to consent or dissent, there is no prescribed rule or fixed principle by which the court could attain a conclusion as to the ultimate fact. Upon that fact the jury must pass; not in a wild discretion, but as sworn judges, bound to exercise their utmost ability in comprehending the general rules of the law, and applying them to the circumstances of the case, so as to *103 attain an honest and just conclusion. 1 Stark. Ev. 409, et seq. The jury having then found the existence of undue influence in this case, and done so for the second time, after a charge, fully explaining the law, and in the main favorable to the executor, and it now appearing that the connexion of the influence with the will in question depends not upon; Ellen Brock alone, but is proved also by Mrs. Mansfield, and perhaps by Wm. Dawkins and Edward Jackson, can this court say that no view which can be taken of the testimony will support the verdict 1 It is unnecessary, and might be wholly unjust, to point out how, by presenting strongly some parts of the evidence, and disbelieving other parts, the case could be clearly reconciled with the verdict. Sufficient it is to say, in the words which conclude the opinion in the case of Tillman vs. Hatcher, “Upon the whole, the court is constrained to follow the common rule, that where the case consists of facts which have been fairly submitted to the jury, with full instructions from the court, their verdict concludes the case.”
The motion for a new trial, is therefore dismissed.
Evans, Butler and Earle, JJ., concurred.
O’Neall, J. did not hear the argument and gave no opinion.
Richardson, J.
The former decision, referring this case again to the trial by jury, was well considered.
But in a case which has excited much interest, and in ivliich my own opinion has been, at least in one respect, changed, I would not lose the opportunity of offering my own views of its legal principles and proper merits.
1. It is a plain principle of law, that where any estate, in land or personal property, is given, whether by bequest or deed of conveyance, subject to a condition, inconsistent with the legal character and use of the estate, such condition is null and void, and the estate is left, unqualified, in the hands of the legatee or donee.
This is a rule inseparable from the meaning of property, or the lawful dominion of men over its subject matter. Yet, an error seems to be lurking, respecting one species of property. That by calling such condition a trust, *104 this legal doctrine may be suspended in the case of slaves, and the estate in them qualified in the hands of the donee, so as to make the estate enure to the benefit of the slaves themselves, who are the very subject matter of the estate given.
But it is plain that such a so called trust would be a condition incompatible with the right to use the property for its legal ends. It would be a trdst for the use of the property itself, not for a third party, which would destroy the right of the donee for any particular use or civil dominion of his own.
You might by such a device give the agency of the do-nee to the slaves. But how could it be called giving the use of the slaves to the donee ?- If the former, the contract would constitute the emancipation of the slaves. But this the law prohibits. We are obliged, therefore, in order to suppose the donation, to adopt the other construction, and give the slave to the donee; and of course, under the rule just noticed, without the incompatible condition aimed at; otherwise you either run into the- construction so repudiated by our laws, or must hold the donation null and void.
But this last is always to be avoided. If you can give any contract a sensible and legal construction, it is good to that extent, upon the undoubted principle that private interest is to be sacrificed to a public object only to the extent absolutely necessary. (Black. C. 29.) This rule in favor of vested rights supports the bequest to the extent that the testator had a legal right to give, and does not destroy his will, because he wished to go further. If such a bequest had been of a horse in trust, that all his earnings should enure to his own keep, clothing and currying, every one would perceive how inconsistent such a condition would be with any property in the horse. But if the law expressly prohibited that a horse should be endowed with such a priviledge, how much stronger would the case be. Yet, still, the testator would have a right to bequeath his horse to any legatee, and the trust intended would be no more than a moral injunction to treat the horse well.
And such is the primary rule for the construction of all such wills as W. B. Farr’s, which would qualify the strict legal ownership of the legatee of slaves, in favor of the *105 slaves themselves, by calling such qualification a trust. The primary civil principle is, that the slave is property, and must be so given; and here let me add, that the apprehension of a chosen legatee, regarding more the mere injunction of a testator, than his children or nearest of kin; is assuredly opposed to our experience of men: the converse is nearer the truth. The former decision upon the will of W. B. Farr, stands, therefore, upon the unquestionable principles, both of law and of a wise policy. Dr. Thompson takes the slaves unconditionally. Still I shall dissent on one point of law, which will be considered hereafter.
For the present, I proceed to the second subject I would consider.
2. Verdicts setting aside last wills, upon the grounds of mental weakness, or of undue influence, practised upon the testator, have become somewhat frequent; I would therefore give my understanding of the requisitions and rules of law, applicable to such cases.
The general rule is, that the testator must be of “sane memory and reasonable mind,” in order to make a last will of his estate; and that he shall have been of a “disposing mind,” at the time and in respect to the particular will offered for probate.
The rules of law, taken from many adjudications, and generalized (see 4 Co. 126; Rich, on Wills, 40; Brev. tit. 3, p. 100; Swinb. 474; Bac. 7 vol. 302 ; 2 Black. 497; 4 Dane, p. 560, (fee. (fee. and recognized by Judges, in order to point out certain exceptions to the general right of making last wills,) are summed up by Roberts on Wilis, p. 30, in the following words: “No person who is.not of a reasonable mind and sane memory, can make any disposition by will. Therefore an idiot, or person deprived of his faculties, by extreme age, or by intoxication, while the paroxism endures, is not of reasonable capacity in law,” (fee.
“And (p. 31,) the rule is clear, that there must be the animus testandi, (mind disposed to make a will,) or the instrument, purporting to be a will, is of no effect in the law. The parties must therefore be free and under no compulsion from such threat or violence as may reasonably be supposed to move a constant man.” Coke says, “a *106 non compos is one who has no discretion nor the use of reason.”
Bacon (v. 7, p. 301,) lays down the same general rules, and concludes thus: “It is requisite, when the testator makes his will, that he be of sound and perfect memory, i. e. that he have a competent memory and understanding, to dispose of his estate with reason.”
Blackstone does the same. (2B1. p. 417.) He says: “Such persons as are born deaf, blind and dumb, who, as they have always wanted the common inlets of understanding, are incapable of having the animus testandi, and their testaments are therefore void.” The reason given by Blackstone, that such testators lack the inlets, (i. e. the chief senses,) to human knowledge, gives the clue and guide to the meaning of “sane memory'and reasonable mind.” According to such reason, by looking into the rules as laid down, and the adjudged cases from which they have been drawn, we .plainly perceive the principle of their requisitions. There are four requisitions that relate the three first to the mind or intellect, and the last to the free will of the testator. If possessed of the required understanding, and his moral will be unconstrained by extrinsic influences, he then may make a last will of his property.
In applying such rules to the competency of a particular (estator, it is not surprising that the Judge and the jury often differ.
The rules themselves do not express their own exact meaning very clearly, and are to be applied to the competency or incompetency of the human mind, and its will, as deduced from reasoning; both of which are difficult of investigation and of clear comprehension.
In most countries these rules are applied by the Judge alone. And the object of the following exposition is intended to render them less obscure, by defining their meaning separately.
As to the first requisition: It is plain that to be of the “sane memory” required, the testator must have been of mental capacity, to perceive and recognize external facts and things, in the manner of men in general; i. e. through the medium of his senses. These are “the inlets to the understanding,” noticed by Blackstone. Wanting sight, *107 hearing and speech from birth, is conclusive against deaf, dumb and blind testators.
The perception of facts, through the senses, is then, the first faculty or operation of the mind required by law; and it is by every man’s observation and reflection, the source of his own knowledge, and the means both of his understanding and memory, in order to constitute him a rational and moral civil agent.
Secondly: If the testator can retain in mind the facts and things so perceived and recognized, whether for a longer or shorter time, so that he may conceive of them, and reflect upon their import, without confounding them with mere imaginations or hallucinations, or the speculations of other men, he then has “sane memory.” For although it may be a short, a slow, or a confined memory, it may still be sane, i. e. not false or unfaithful to the facts before perceived, according to its strength and indurance.
Thirdly: The testator must have a “reasonable mind;” that is, he must be capable of reasoning upon, and comparing, by means of his own recollection, (conception and reflection,) the facts perceived and remembered, so as to come to the rational conclusion which constitutes the mental and moral will of every dispassionate and unbigotted man, as drawn by his own induction from known facts.
Such are the rules of law, as assuredly they are of sound metaphysics, to prevent partiality or prejudice, or the exercise of an unsound discretion, in judging of the mental competency of men to execute last wills and testaments of their property.
A testator may, as Bacon expresses it, be “of a mean understanding only,” have “grossum caput” (a blockhead) and be “of the middle sort, between a wise man and a fool, yet is not prohibited to make a will;” (7 Bac. 381,) or, as Dane says “a weak man may be legally sane,” <&c. &c. “Tho’ one has lost much of his mind, he may be compos;” (competent to malte a will,) “as if one’s mind be very eminent at forty-five, and much enfeebled at seventy-five; yet he is compos, if not very childish.” (4 vol. 467.) If we applyhhe rules first laid down, the reasons are plain; such a man still perceives and recognizes facts and things; remembers and conceives of them, as truly existing, com *108 pares and reasons upon them, in order to come to his own conclusions and will, in a matter of his own individual right. Such a man must not be disfranchised, because his perception has become dull, his memory weak and his reasoning slow. It is enough if they are not so unfaithful as to make the man again a child.
But, fourthly: The testator must have had the “animus testandi;” that is, his own free conclusion and wish, to adopt the particular last will offered for probate. Bacon calls it “a mind or serious intention to make such a will.” (7 vol. p. 303.) It follows then, (which is the most important point in the appeal before the court,) that what is called undue influence, consists in the application of some extrinsic power to control the disposing mind of the testator, so as to exhibit as his testament, whát was not his free will. Bacon calls it, “by fear, fraud, or flattery.” 7 Ba. 303.
In this State, fear, fraud, or flattery, when applied to constrain, circumvent or cajole the testator, has been called “undue influence." It is the antagonist of the true animus testandi, or disposing mind.
For although the testator may have the sane memory and mind necessary, and be well disposed to make his will, yet such disposing mind may be turned by the influence of other persons, either by moral or physical coercion. As by threats or importunate persuasion, or by the infinite means of the habitual manager of a weak man, to make a will different from that he really wished.
Such a will would not conform to his disposing mind, and would therefore be void, by reason of undue influence.
Lastly, then: To apply the principles of last wills, and the meaning of undue influence, to the case before the court. It is by undue influence only, that the supposed will of Win. B. Farr, in favor of Dr. Thompson, can be set aside. That he had a sane memory, and a reasonable mind, sufficient for the purpose, is evident; at least, the contrary is not proved, and that-he had a mind entirely disposed, from at least 1828, to make a will of his property to some legatee in whom he confided, to fulfill certain supposed trusts, in favor of his two slaves, Fan and Henry, is still better proved. Such uniformity, for at least twelve years, is, perhaps, conclusive, both of sanity of his wish *109 and will. How then can the verdict setting aside the will and bequest to Dr. Thompson be supported 1
The threats and importunity practiced, are all in furtherance and aid of the disposing mind of W. B. Farr, to bequeath his property in tlie very way and for the purposes so well understood and proved to belong both to the will of 1828 to Judge O’Neall, and that of 1840, to Dr. Thompson. The purposes or supposed trusts of the bequest are the same, and void; but the bequest itself, good and legal. So far, the will in question seems well supported. Still, two juries have now decided that the will of 1840 was procured by undue and improper external influence practiced upon the testator, when liis mind, though sound, had become weakened by age and bad habits; and an intermediate and third jury could not agree upon any verdict.
At these three several trials, the charge of the presiding Judge had been in support of the will in question, as had been also the decision of the ordinary of the district, in the first instance; but successive and identical verdicts are to be greatly respected; and when the testator has left another will of the same bequests, import and trusts, and which will is perhaps unimpeachable; and if so, the great and material object of avoiding the testator’s disfranchisement may be answered. In such a case, the court will much more readily acquiesce in a verdict rendered upon the question of undue influence, although differing from its own opinion. For the argument, when there is a former will of testator, see appendix to Pothier, especially page 583.
Upon the precise question of improper influence in this case, the evidence has two bearings. The first I have considered, i. e. its influence upon the disposing mind of W. B. Farr, to make any such bequests. Secondly, and now to be considered, its influence to bring about and cause him to change his legatee from Judge O’Neall to Dr. Thompson.
The whole stress of the objections to the will, rests upon this last position. To say that a man can be unduly influenced to make the very bequest he always wished to make, is to utter an absurdity; but to say that he has been influenced to make the same bequest to a new legatee, is very *110 intelligible; and this is the true and only ground to support the verdict, setting aside the will of 1840. The threats and importunities of Fan; the fears and complaints of the testator, or any supposed management of Dr. Thompson, can have no bearing upon the evidently disposing mind of W. B. Farr, but in turning it from the former legatee to the latter. It is the only one in which improper influence could have been called for or needed.
By the proper construction of both wills, under the principle already explained, that of 1828 is a sweeping bequest in favor of a named legatee; and by the will of 1840, the same sweeping bequest is given to a different legatee. The true aim of the testator, to emancipate and enrich Fan and Henry, is as sure under the one will as the other; and the real conflict and legal interest, however liberally treated, are between these two legatees, or at least so far as we can understand from the two wills, or their evident right and interest under them respectively.
Under such circumstances, and with such equal consequences, there is no great reason to apprehend the final disfranchisement of W. B. Farr, in his right to leave a valid last will to be submitted to judicial construction.
For such considerations, and after three trials before juries, my understanding is led, I think, considerately, rationally, and judicially, to change the opinion formed upon the former appeal to this court; and to acquiesce in this second verdict, upon grounds somewhat similar to those that finally reconciled my judgment to the verdict setting aside the last will of old Lucy Hatcher, which, in that case, as in this, left an earlier will which might be still enforced, and would serve to recognize the aged testatrix as a free agent, although the verdict had passed against her disposing mind, at the age of ninety-three years; and accordingly, her will made a few years earlier, has been admitted to probate. And such may be the final event of the case before the court; and W. B. Farr be in like manner still recognized as of a sound and disposing mind.
The very interesting, and much discussed, and it would seem, unsettled question, what is the degree or force of undue influence necessary to set aside a last will ? — and is it *111 strictly to be decided by the Judge 7 brings us to the point of difference before alluded to.
It is easy to perceive that undue influence must bear upon the disposing mind of the testator, in the particular matter or object of his will. The general influence of one mind over another, can be no more than preparatory to a more specific and close influence upon the particular disposing mind of the testator in the proposed will. Such influence should tend to force or induce a factitious or pretended disposing mind, or to negative and alter his truly disposing mind, so as to substitute the pretended mind in its place.
In general, the observation and opinions of the subscribing witnesses, (who are placed, by the meaning and good policy that require such witnesses, as the legal guards of the testator,) should have much weight for or against the will; and both upon the general moral competency of the testator and his particular disposing mind, in the will witnessed by them. But no such rules or recommendations can point out the degree of influence necessary to set aside the will.
How can any rule other than upon the bearing of the influence over the particular disposing mind be laid down 7
Let me illustrate this by an actual occurrence.
I once attended in his last illness a very respectable and strong minded man, to draw his last will. I found him well disposed to settle his worldly concerns by will. But his whole understanding was barely sufficient, if uninfluenced and not tampered with, to comprehend and execute his last will, by his own mind, memory and discretion. And I left him with this opinion, that any importunity or unfair management of his wife or son, which were not suspected, might alter his disposing mind.
Now, the external influence which would have easily negatived or warped the disposing mind of that testator, would have been but a feather in the degree and weight of influence that could negative, displace, or alter the strong-will of such a man as Andrew Jackson.
It is plain, therefore, that we can do no more than indicate the character, or rather, the bearing of the supposed influence upon the particular disposing mind of the testa *112 tor; not its degree or weight, but its tendency and direction to warp the disposing mind.
If such be the proper meaning of undue influence, it necessarily leaves the final decision to the verdict of a jury, as in other cases of unjust imposition, or circumvention, eventuating in a practical fraud. Undue influence is, therefore, not a question of law, but an investigation of fact for the jury to decide, after the aid of the Judge in drawing their attention to its proper meaning.
Lastly: There is a point-of pleading in this case, which I would notice. D. A. Thomas, one of the appellants from the decision of the ordinary, was proved to be a stranger to the estate of W. B. Farr, and of course had no privity or right of action. The evidence of this fact was made on the part of the executor. But no motion was made to strike Mr. Thomas’s name from the record, on either side. Can the executor now have the advantage of the oversight, either by a new trial or in arrest of the verdict, or judgment 1
It may be regarded as a settled rule in pleading, that he whose legal right to sue is disproved, or where his interest does not appear, cannot recover at law. The real parties can, in no way, proceed in the name of their friends or agents, or unite with strangers. Such a practice would lead to the most alarming species of maintenance — that of popular names and powerful men; and complex and important cases, like the one now before the court, might be made to turn upon personal or party influence. This rule is especially necessary in the popular trial by jury. In the case of dormant co-partners, it is fully illustrated. Every new name must prove his co-partnership interest. But the rule belongs to all cases at common law, and is by no means merely technical, but practical, just and necessary. And I can perceive no reason why it should not apply, in all its strictness and good policy, to men associated in an appeal from the decree of the ordinary, to the trial by jury, under our statute law. Such is the very case in which the association of names is easy, if not at pleasure, bringing about the very injustice or influences the law would guard against.
Note. — According to the Act of 1839, 11th section, when a last will and testament has been admitted to probate, in common /ofra, which may be done without citing or calling before the Ordinary such as have interest, it shall be good, “unless some person or persons interested to invalidate the said paper as a will, shall give notice to the Ordinary, within four years next after such probate, (or if any party interested therein shall be subject to the disability of infancy, then within four years next after such disability removed) that he, she, or they, do require it to be proved in due form of 1cm." The Act further provides that the Ordinary shall proceed to cite all such persons as would have been entitled to distribution of the estate, if the deceased had died intestate.
But I have some doubts, after a party has omitted, perhaps purposely omitted, to make any objection to Mr. Thomas being a party, either to the court or the jury, whether he can now be allowed to surprize the opposite party, by making the objection when it is too late for the name of Thomas to be stricken out, and the case progress on its merits.
In the case of dormant partners, alleging their interest, and not proving it, I feel clear that the defendant could not raise the objection, for the first time, in this court; and the only difference is, that in the case before us, the executor expressly proved the want of privity or interest of Mr. Thomas, which intimated to the appellants that he could not be a party, and put them on their guard.
But as a majority of the court think the objection comes too late, this important rule of pleading being preserved, I will not urge so doubtful an application of it further than by a single quotation and reference to authorities.
Sergeant Shepkin, in his admirable book on the principles of pleading, lays down the rule, drawn from decided cases, (3 Bos. & Puller; Camp. 195 ; 4 Taunt, 310.) He says: “ The name of a person, not a party, is a point on which the averment must correspond with the proof, under penalty of a fatal variance.” See, also, Saunders Pleadings, 61; Gold. do. 292; 1 M‘Cord, 434; 1 Baily, 306-608; 2 do. 290. _ '
_ It is at the peril of the party suing, that he mistake not the true plaintiffs. Doubting only on the application of this rule to the particular case, I acquiesce in the judicial reasoning that rejects the motion for a second new trial.